IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

LOWMORREO A. HARRIS, SR.,

                        Plaintiff,

    v.

EDWARD WALL,[1] LIZZIE TEGELS,
JEFF JAEGER, CHARLES DEVENDORF,
LARRY FUCHS, TIM THOMAS, JASON
ACTERBERG, CAPT. KANNONBERG,
CAPTAIN CRASPER, SGT. KORAN,
C/O BENDER, SOCIAL WORKER NAVIS,
FLADHAMMER, JOE THYNE, BRENDON
IHGENTHRON, JANE OR JOHN DOE and
CAPT. BAKER,

                   Defendants.

OPINION AND ORDER

14-cv-047-wmc

Pro se prisoner Lowmorreo A. Harris, Sr. brought this proposed civil action under 42 U.S.C. § 1983 in January of 2014, contending that prison staff violated his rights under the constitution in retaliation for his filing grievances against them.  He also contends that he has been denied due process, access to the courts, and the right to be free from unlawful searches and seizures.  Harris has made an initial partial payment of the filing fee in accordance with 28 U.S.C. § 1915(b)(1), so his complaint is ready for screening under 28 U.S.C. § 1915A.  Because he is a *pro se* litigant, Harris is held to a "less stringent standard" in crafting pleadings. *Haines v. Kerner*, 404 U.S. 519, 521 (1972).

---

[1] Plaintiff named "Edward Walls" as a defendant in his complaint and identifies "Walls" as the Secretary of the Wisconsin Department of Corrections.  Cpt. at 11.  The correct spelling of the Secretary's name is "Edward Wall."  The clerk of court is directed to amend the caption accordingly.

On July 2, 2015, Harris submitted a motion for leave to amend the complaint, including a proposed amended complaint. The court will grant this motion and consider the amended complaint as the operative pleading in this case. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). Having now done so, the court will further allow Harris to proceed on his claims that (1) defendants Jeff Jaeger, Charles Devendorf, Captain Acterberg, C/O Bender and Captain Baker retaliated against him in violation of the First Amendment; and (2) Jaeger and Baker violated his right to procedural due process at the January 31, 2013 disciplinary hearing. Harris's allegations are not, however, sufficient to state viable claims against any other defendant.

## ALLEGATIONS OF FACT[2]

### A. The Parties

During the time relevant to the complaint, Harris was a prisoner at the New Lisbon Correctional Institution ("NLCI"). The following defendants were employed by Wisconsin Department of Corrections ("DOC") at NLCI during the same time frame: Lizzy Tegels (the warden); Jeff Jaeger (business office supervisor); Charles Devendorf (business office employee); Larry Fuchs (security director); Tim Thomas (deputy warden); Jason Acterberg (segregation program captain); Captain Kannonberg, (administrative captain); Captain Crasper (supervisor); Sergeant Koran (inmate

---

[2] For purposes of this order, the court assumes the facts above based on the allegations in Harris's amended complaint.

2

advocate); Officer Bender (property sergeant); Navis (unit social worker); Flad Hammer (due process committee supervisor); Joe Thyne (due process committee manager); Brendon Ihgenthron (complaint examiner); Jane or John Doe (record's office supervisor); and Captain Baker (due process committee member).  Harris has also named DOC Secretary Edward Wall as a defendant.

### B.  Harris Files Complaints against the Prison Business Office in July 2012.

On July 13, 2012, Harris sent an inquiry to the NLCI business office regarding funds that he believed had been deducted improperly from his inmate account. Defendants Jaeger and Devendorf worked in the business office at the time.  Harris later filed an inmate complaint regarding these deductions.

On approximately July 28, 2012, Harris began to experience delays in receiving legal supplies that he needed for a small claims case he had filed in Milwaukee County Circuit Court.  Harris then filed a series of formal inmate complaints against Jaeger and Devendorf, believing them to be responsible for the delays.

### C.  Harris is Given a Conduct Report by the Business Office

On August 22, 2012, Jaeger and Devendorf in turn issued a conduct report against Harris for "false names and titles" and forgery.  The conduct report charged him with using a false name in his small claims lawsuit.  DOC records apparently indicate that Harris's name is "Mario Harris," although Harris's given name is actually "Lowmorreo A. Harris, Sr."  Harris used the name "Lowmorreo Harris" in his small claims case, which

apparently violated DOC regulations.  The conduct report also accused Harris of forging the Milwaukee County clerk of court's signature on his small claims complaint.

Pending disposition of the conduct report, Harris was strip searched and placed in segregation.  In transport, Captain Baker allegedly told Harris that he would quickly find out what he "needed to start doing and stop doing in order to have a comfortable stay" and that Harris was "not going to be here very long if [he] ke[pt] messing with staff." Harris then wrote to the warden, complaining that he was being retaliated against for filing grievances against the business office.  He also filed another inmate complaint, asserting that he was placed in segregation on retaliatory grounds.

On or about August 25, 2012, Harris was interviewed by defendant Koran, a sergeant who had been assigned to act as his inmate advocate.  Harris explained to Koran that:  the business office was retaliating against him for filing grievances; his birth name is Lowmorreo A. Harris, Sr.; he had just received mail addressed to him as such; and he had not forged anyone's signature.  Harris instructed Koran to obtain Harris's judgment of conviction to prove that he was convicted under the name "Lowmorreo."  He also told Koran that if he obtained small claims forms from the law library he could defeat the forgery charge.

On August 29, 2012, a due process hearing was held on the conduct report. Koran served as Harris's advocate but failed to present the judgment of conviction that Harris had requested.  Koran did present legal documents showing that Harris's legal name is "Lowmorreo A. Harris, Sr."  Koran also presented a small claims complaint form from the law library to rebut the charge of counterfeiting and forgery.  At the end of the

hearing, the charge of forgery was dropped, but Harris was found guilty of false names and titles.

On August 31, 2012, Harris appealed the decision to Warden Tegels. Despite presenting legal documents showing his given name, Tegels affirmed the decision below.

### D. Harris Files Additional Complaints Against the Business Office Following Dismissal of His Small Claims Case

On September 7, 2012, Harris's small claims case was formally dismissed by the Milwaukee County Circuit Court. Harris continued to make efforts to litigate his claim and filed numerous complaints that his access to the courts was being abridged because of his incarceration under the name "Mario Harris." Those complaints were rejected.

On or about November 1, 2012, Harris also tried to refile his small claims suit. On or about November 13, Harris received a letter from the Milwaukee County Circuit Court, informing him that it had received mailings related to the small claims case, but that it was returning the paperwork because his trust account statement had not been certified. According to Harris, Devendorf and the business office should have certified this statement.

On or about December 10, 2012, Harris filed another inmate complaint against Devendorf relating to the business office's alleged failure to certify the copies of his trust account needed for the small claims action. That complaint was dismissed by complaint examiner defendant Brendon Ihgenthron.

On or about December 21, 2012, Harris filed yet another complaint against Devendorf and Jaeger, alleging that they had improperly denied his requests for funds needed to litigate a case in Indiana involving termination of his parental rights.

### E. Given a Second Conduct Report by the Business Office, Harris Has Difficulty Responding

On January 3, 2013, Devendorf issued a second conduct report against Harris for counterfeiting and fraud after Harris allegedly altered a disbursement slip.  Harris was placed in segregation pending resolution of this conduct report as well.  While in segregation, Harris requested his legal property from defendant Bender, the property sergeant, but Bender denied his request.  Harris then sent a request slip to defendant Captain Acterburg about Bender's denial of legal documents, to which Acterburg never responded.

On or about January 7, 2013, Harris's assigned inmate advocate, Sergeant Koran, interviewed him about this second conduct report.  Harris explained that he had various legal papers in his property that he needed for his defense.  Koran said he would personally give Bender a request slip to obtain Harris's legal papers before the hearing. Harris then wrote to Captain Kannonberg about not receiving his property, but Kannonberg responded that he did not supervise Acterberg and that the "security director" was the next level of authority.

On or about January 11, Harris sent a request slip to defendant Larry Fuchs, NLCI's security director, about his legal property.  Acterberg purported to respond on

Fuchs's behalf, but did not address the issues Harris had raised. Instead, he told Harris that he would be given a conduct report if he had been untruthful.

On January 15, defendant Bender came to Harris's cell with his property. Bender began placing paper's in the door trap. After Harris asked her to slow down because papers were sliding on the floor, Bender allegedly responded instead by speeding up, throwing several papers through the trap and telling Harris that he "whines too much." She also began picking through Harris's legal papers, telling him that he did not need several papers concerning Jaeger. Harris responded that he needed all of his legal papers. Bender then allegedly told Harris that he was not getting any more papers, slammed the trap closed, and left with over 3,000 of Harris's legal papers still in her possession.

Harris filed another inmate complaint on January 16, 2013, which was sent back with instructions to resolve his issue via the chain of command. That same day, a hearing was held on Devendorf's second conduct report. Harris maintains that because Bender had not provided him with the relevant papers from his legal property, he was unable to present evidence. Harris received 90 days segregation.

Having still received no response from Acterberg regarding his complaint about Bender, Harris filed another complaint on January 20, which was immediately returned with instructions to resolve it by using the chain of command.

**F.  Harris is Given a Third Conduct Report For Lying.**

On January 22, 2013, Harris was given a third conduct report accusing him of lying about staff. Specifically, Harris was accused of writing a request slip on January 16, alleging that he had not yet received his property, when in fact he had actually received it

7

the day before, on January 15. Additionally, the report accused Harris of lying when he reported that Bender threw his paperwork through the trap.

A hearing on the conduct report was held before defendants Baker and Jaeger on January 31. By that time, Harris had also filed multiple complaints against Jaeger. Upon seeing Harris, Captain Baker said, "So you still haven't learned about lying on my staff?" Captain Crasper, also a proposed defendant, and an inmate testified on Harris's behalf, but Harris was found guilty of lying to staff. This time he was punished with 300 days in segregation.

Harris later filed grievances against Bender and Jaeger for retaliation, but those grievances were rejected also.

### G.   Harris is Given a Fourth Conduct Report by the Business Office

On February 4, Jaeger issued another conduct report to Harris, accusing him of using false names and titles and disobeying orders. The conduct report was again based on Harris's use of the name "Lowmorreo" in legal papers. In his capacity as security director, Fuchs allowed this conduct report to proceed. Harris was again interviewed by Koran and Harris again requested that Koran pull his institution record of conviction before the due process hearing took place.

A due process hearing on the conduct report was held before Captains Fladhammer and Joe Thyne, also proposed defendants, on February 13, 2013. Harris presented multiple legal documents showing that his true name was "Lowmorreo." He also called complaint examiner Ihgenthron to establish that he had filed grievances against Jaeger shortly before he issued this most recent conduct report. Harris also

8

questioned Social Worker Navis about a recent communication Navis allegedly had with the Department of Motor Vehicles regarding a car registered in Harris's birthname, apparently hoping to demonstrate that his legal name is "Lowmorreo." In turn, Navis testified that he did not know Harris's real name.

Harris was again found guilty of using false names and titles, as well as disobeying orders. This time, he was penalized with 330 days in segregation and a transfer to Wisconsin Secure Programs Facility in Boscobel, Wisconsin ("WSPF").

### H. Harris's Confinement at WSPF

For approximately 14 months at WSPF, Harris was confined to his cell for 23-24 hours a day and kept under constant camera surveillance. On some days, Harris could leave his cell for a one-hour recreation period during which he was escorted outside in shackles. On several occasions, Harris suffered from burning and coughing, which he attributes to gasses used in cell extractions and that are then circulated through the ventilation system. While at WSPF, Harris also alleges that he suffered from extreme paranoia and sleep deprivation.

## OPINION

Harris purports to allege claims against various defendants for retaliation under the First Amendment, due process violations under the Fourteenth Amendment, unlawful search and seizure under the Fourth Amendment, and denial of his right to access the courts. Each legal theory is considered below.

## I. Retaliation

To state a claim for retaliation, a plaintiff must allege that: (1) he engaged in activity protected by the Constitution; (2) the defendant subjected the plaintiff to adverse treatment because of the plaintiff's constitutionally protected activity; and (3) the treatment was sufficiently adverse to deter a person of "ordinary firmness" from engaging in the protected activity in the future. *Gomez v. Randle*, 680 F.3d 859, 866-67 (7th Cir. 2012); *Bridges v. Gilbert*, 557 F.3d 541, 555-56 (7th Cir. 2009). Harris contends unhelpfully that the defendants retaliated against him by giving him conduct reports, placing him in segregation, dismissing his inmate complaints, and eventually, transferring him to WSPF because he had filed several complaints regarding Jaeger, Devendorf, Bender and others.

Under the less stringent pleading standards applicable to pro se litigants, Harris's allegations are sufficient to state claims of retaliation against defendants Jaeger, Devendorf, Bender, Acterburg and Baker. Harris alleges that he engaged in a constitutionally protected activity by filing grievances regarding his inmate account, legal mail and other actions taken by prison staff. This conduct satisfies the first element of his retaliation claim: Harris has constitutional rights under the First Amendment to free speech and to petition the government for redress of grievances, including the right to file grievances about misconduct by prison officials. *Powers v. Snyder*, 484 F.3d 929, 932 (7th Cir. 2007); *Pearson v. Welborn*, 471 F.3d 732, 740-41 (7th Cir. 2006).

With respect to the second and third elements of his claim, Harris alleges that in response to his grievances: (a) defendants Jaeger and Devendorf wrongfully wrote him up

in numerous conduct reports and interfered with his legal mail; (b) defendant Bender withheld Harris's papers and filed a false conduct report against him; (c) defendant Acterburg ordered Bender to write a false conduct report against Harris; and (d) defendant Baker found him guilty of a false conduct report and punished him with segregation.  At this preliminary stage, these allegations are sufficient to state retaliation claims against each of those defendants.  *See Bridges*, 557 F.3d at 552 (allegations of false disciplinary charges, interference with mail, and harassment by guards are sufficient to show at the screening stage that the defendants' actions would deter a person of ordinary firmness from exercising his constitutional rights).

At later stages in this case, Harris should be aware that he will need to prove his retaliation claims against these defendants with facts, rather than the allegations in his complaint, *Sparing v. Village of Olympia Fields*, 266 F.3d 684, 692 (7th Cir. 2001), or his personal beliefs, *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 539 (7th Cir. 2007).  Indeed, to prove his claims at summary judgment or trial, Harris will have to come forward with specific evidence in the form of sworn testimony or admissible documentation, permitting a reasonable jury to find in his favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56.  For example, Harris will need to come forward with admissible evidence showing that defendants Jaeger, Devendorf, Bender, Acterburg and Baker issued conduct reports, interfered with his mail and legal papers, or punished him all because he exercised his constitutional rights and not for some legitimate reason.  This means that he will have to prove that these defendants subjected him to adverse

treatment because he complained about staff misconduct, *not* because they believed he had violated prison regulations or had lied about staff.

Finally, although Harris contends generally in his amended complaint that *all* of the named defendants are liable for retaliation, the factual allegations of his amended complaint do not support this contention against any of the other defendants.  Harris would fault Secretary Wall, Warden Tegals, Deputy Warden Thomas and Security Director Fuchs for failing to overturn the results of the allegedly retaliatory conduct reports and disciplinary hearings;  defendants Kannonberg, Fladhammer and Thyne for the outcomes of the disciplinary hearings; Crasper, Koran, Navis and Jane or John Doe for providing incomplete information or for failing to advocate persuasively on his behalf; and defendant Ihgenthron for rejecting his inmate complaints regarding other defendants' alleged retaliatory conduct.

Defendants can be liable for retaliation only if they were "personally involved" in acts of retaliation.  *Minix v. Canarecci*, 597 F.3d 824, 833-34 (7th Cir. 2010); *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009) (§ 1983 makes public employees responsible "for their own misdeeds but not for anyone else's").  For this reason, a defendant cannot generally be held liable under § 1983 simply because the defendant had knowledge of another's past misconduct. *Ashcroft v. Iqbal*, 555 U.S. 662, 677 (2009). A defendant must "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012) (*quoting Jones v. City of Chicago*, 856 F.2d 985, 992–93 (7th Cir. 1988)).  Moreover, supervisors and administrators, such as Wall, Tegals, Thomas,

and Fuchs, are entitled to relegate to others the primary responsibility for specific prison functions without becoming vicariously liable for the failings of their subordinates. *Burks*, 555 F.3d at 595-96 ("Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job.").

Here, Harris's allegations do not support an inference that defendants Wall, Tegals, Thomas, Fuchs, Kannonberg, Crasper, Fladhammer, Thyne, Koran, Navis, Ihgenthron or Jane/ Jone Doe were personally involved in retaliating against Harris or that any of them intended to retaliate against him because he had exercised his constitutional rights. Accordingly, Harris may not proceed against these defendants on claims of retaliation.

## II. Procedural Due Process

Harris also claims that his due process rights were violated and that he suffered an "atypical and significant hardship." (Am. Compl. (dkt. #14) at 11.) Although Harris does not explain specifically how or when his due process rights were violated, the allegations in his amended complaint concern claims of inadequate procedural due process during the various disciplinary hearings held to consider conduct reports against him.

A prisoner challenging the process afforded in a prison disciplinary proceeding must show that: (1) he has a liberty or property interest with which the state interfered; and (2) the procedures he was afforded upon that interference were constitutionally deficient. *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989); *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697 (7th Cir. 2009); *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th

Cir. 2007). Harris's due process claim appears to be grounded on an alleged deprivation of a "liberty interest," as he alleges that he faced "atypical and significant hardship." In the prison context, deprivations of a liberty interest amounting to an "atypical and significant hardship" would bring the due process clause into play. *Sandin v. Conner*, 515 U.S. 472, 484 (1995). *See also Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013).

While Harris does not specify the nature of his liberty interest here, the only allegations in his complaint that implicate a liberty interest are Harris's allegations that he was placed in segregation and ultimately transferred to WSPF after being found guilty of violating prison rules. Certainly, a prisoner's placement in segregation may create a liberty interest "if the length of segregated confinement is substantial and the record reveals that the conditions of confinement are unusually harsh." *Marion*, 559 F.3d at 697; *see also Townsend v. Cooper*, 759 F.3d 678, 687 (7th Cir. 2014). Here, Harris alleges that: (a) after a disciplinary hearing on January 16, 2013, he was found guilty of counterfeiting and fraud, and he was punished with 90 days in segregation; (b) after a disciplinary hearing on January 31, 2013, he was found guilty of lying about staff, and he was punished with 300 days in segregation; and (c) after a disciplinary hearing on February 13, 2013, he was found guilty of using false names and titles and disobeying orders, and he was punished with 330 days in segregation and transferred to WSPF.

As an initial matter, although understandable if Harris presumed it obvious, he does not expressly allege that conditions in segregation during any of these three terms of segregation were unusually harsh. This is particularly important, at least according to the

14

Seventh Circuit, whose decisions are obviously controlling for this court, with respect to Harris's claim relating to the process he received at the January 16, 2013, disciplinary hearing because the 90-day term of segregation is not long enough to "work an atypical and significant hardship." *Lekas v. Briley*, 405 F.3d 602, 612 (7th Cir. 2005).[3]  Whether Harris's 300 and 330-day terms of segregation would implicate a liberty interest is a closer question.  Although Harris again does not allege that the conditions of segregation were unusually harsh, the Seventh Circuit has already ruled that (1) "periods of confinement that approach or exceed one year may trigger a cognizable liberty interest without any reference to conditions"; and (2) the issue of whether 240 days in disciplinary segregation is a type of "atypical, significant hardship," for purposes of a denial of due process claim, cannot be decided at the pleading stage.  *Marion*, 559 F.3d at 697-98.

Assuming Harris had a protectable liberty interest with respect to at least the longer to periods of segregation imposed, he is entitled to due process before being punished, but unfortunately for Harris, a prisoner facing transfer to and confinement in segregation is still only "entitled to informal, nonadversarial due process." *Westefer v. Neal*, 682 F.3d 679, 684 (7th Cir. 2012) (citing *Wilkinson v. Austin*, 545 U.S. 209, 211-12 (2005); *Hewitt v. Helms*, 459 U.S. 460, 476 (1983)).  This "requires 'some notice' of

---

[3] Even if the court were to infer some kind of dubious, substantive due process claim with respect to the 90 day period of incarceration – based on a lack of proportionality between the violation found (using his legal, rather than prison, name in legal filings) and the punishment imposed -- Harris's claim would fail given Seventh Circuit case law acknowledging good reasons for an institution insisting on an inmate using the same name in correspondence and filings, whether inside or outside of prison.  See discussion, *infra*.

the reasons for the inmate's placement . . . and enough time to 'prepare adequately' for the administrative review." *Westefer*, 682 F.3d at 684. "Informal due process requires only that the inmate be given an 'opportunity to present his views'" to a neutral decisionmaker; it does not require a hearing with the inmate present. *Id.* at 685. "If the prison chooses to hold hearings, inmates do not have a constitutional right to call witnesses or to require prison officials to interview witnesses." *Id.* (citations omitted). Finally, inmates are not entitled to a written decision describing the reasons for placement; they are entitled only to review of the placement by a neutral reviewer. *Id.*

Here, Harris affirmatively alleges that he was afforded formal due process hearings before receiving each of his three terms of segregation described in his amended complaint. In other words, Harris was provided with more formal process than required by the Constitution. Obviously, to state a viable due process claim under these circumstances would require Harris to allege that the formal due process hearings somehow otherwise failed to satisfy the requirements for informal process set forth in *Westefer*, *Wilkinson* and *Hewitt*. Harris's allegations do not support such an inference for either the January 16 or February 13, 2013, disciplinary hearings. In particular, Harris alleges neither that he was denied notice, nor given inadequate time to prepare adequately for the hearings. The Supreme Court has held that inmates must receive notice "[a]t least a brief period of time . . ., no less than 24 hours," before a hearing to revoke good-time credits. *Wolff v. McDonnell*, 418 U.S. 539, 564 (1974). Moreover, revocation of good-time credits extends the length of an inmate's incarceration, which has been held to implicate "a more significant liberty interest" than placement in

16

segregation and to require "a greater measure of procedural protection." *Westefer*, 682 F.3d at 684.

Similarly, Harris's affirmative allegations that there were several days between when he received conduct reports and when due process hearings were held also establishes that he received more time than required by the Constitution to prepare. Harris also does not allege that he was denied the opportunity to present his views at any of the hearings. Although he complains that he was not able to present all of the evidence he wished, informal due process requires only that an inmate be permitted to "present his views." *Id.* at 685. Generally, a "written statement by the inmate" would be sufficient to satisfy this requirement. *Id.* Because Harris was allowed to make an oral presentation at each hearing, he was provided even more process than was required. Finally, Harris does not allege that the decisionmakers at the January 16 or February 13, 2013, disciplinary hearings were biased.

The sole exception in this regard is the January 31, 2013, hearing. At that hearing, Harris alleges facts supporting an inference that the decisionmakers, defendants Jaeger and Baker, were not impartial. By the time that hearing was held, Harris alleges he had filed numerous complaints against Jaeger, and that Jaeger had filed conduct reports against Harris. As for Baker, Harris alleges that Baker accused him both before and during the hearing of lying about staff. If these allegations are true, Harris may be able to prove that Jaeger and Baker were not impartial decisionmakers. On this basis, Harris may proceed with his procedural due process claims against Jaeger and Baker beyond the screening stage.

17

As a final point, it appears that many of Harris's frustrations stem from the fact that he was punished, rather harshly, simply for using his birthname in legal filings or disbursement requests.  However, prison regulations require inmates to use the "name under which the inmate was committed to the department, unless the name was legally changed."  Wis. Admin. Code § DOC 303.35(2).  Additionally, prison regulations allow inmates to use a legally changed name only if the inmate also includes "the name under which the inmate was committed to the department."  *Id.* § DOC 303.35(3).  Although Harris alleges that his "legal name" is actually Lowmorreo A. Harris, Sr., he has not denied that he was "committed to the [DOC]" under the name Mario A. Harris.  Thus, Harris violates the DOC regulation each time he uses the name Lowmorreo A. Harris, Sr. without also including "aka Mario A. Harris."  While Harris is obviously frustrated by this regulation, his belief that it is unfair or that his punishment was too harsh does not mean that he was denied the minimum due process protections afforded by the Constitution, particularly since according to his own allegations, his harshest punishment came after his continued, obstinate refusal to comply with the rule.

### III. Unreasonable Search and Seizure.

In his amended complaint, Harris next alleges claims for violation of his Fourth Amendment right to be free of unlawful searches and seizures.  Although he does not say so expressly, the court assumes Harris's Fourth Amendment claim is based on his allegations that he was subjected to strip searches before being taken to segregation.

Harris's allegations do not support a claim that his Fourth Amendment rights were violated.  The Fourth Amendment requires law enforcement officials to act in a

reasonable manner when they subject people to searches of their person or property. *King v. McCarty*, 781 F.3d 889, 899 (7th Cir. 2015).  Harris has not alleged that he was treated unreasonably during the strip searches, and the Seventh Circuit has held that routine visual strip-searches of prisoners do not violate the Fourth Amendment.  *See id.* (concluding that prisoner's allegations regarding lengthy strip search failed to state claim under Fourth Amendment claim).  In *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. ——— 132 S. Ct. 1510 (2012), the Court held that invasive strip and body-cavity searches of detainees entering the jail's general population did not violate the Fourth Amendment.  It is no great leap to conclude the same with respect to the placement of a prisoner when entering a new, arguably more dangerous, and certainly less compliant, population of prisoners.  Accordingly, Harris may not proceed on a claim under the Fourth Amendment.

## IV. Access to the Courts.

Finally, Harris claims that his constitutional right to access the courts was violated.  Although he does not explain specifically when or how he believes this right was violated, the court infers his claim is based on allegations that his small claims case was dismissed after Jaeger and Devendorf obstructed his mail and refused to provide him with the materials needed to litigate the case.

These allegations do not support a claim that he was deprived of his constitutional right to access the courts.  A prisoner's right to access the courts is limited to the ability to file claims challenging a sentence or conditions of confinement.  *See Lewis v. Casey*, 518 U.S. 343 (1996); *Bounds v. Smith*, 430 U.S. 817 (1977).  Because Harris has not alleged

that he was denied the right to access courts to challenge his sentence or conditions of confinement, he may not proceed on a claim for denial of access to the courts.

ORDER

IT IS ORDERED that:

(1) Plaintiff Lowmorreo Harris's motion for leave to amend his complaint (dkt. #13) is GRANTED;

(2) Plaintiff Lowmorreo Harris is GRANTED leave to proceed on claims that:

   a. Defendants Jeff Jaeger, Charles Devendorf, Captain Acterberg, C/O Bender and Captain Baker retaliated against him; and

   b. Defendants Jaeger and Baker violated his right to procedural due process at the January 31, 2013 disciplinary hearing.

(3) Plaintiff is DENIED leave to proceed in all other respects. Defendants Lizzy Tegels, Larry Fuchs, Tim Thomas, Captain Kannonberg, Captain Crasper, Sergeant Koran, Navis, Fladhammer, Joe Thyne, Brendon Ihgenthron, Jane or John Doe, and Edward Wall are DISMISSED.

(4) Pursuant to an informal service agreement between the Wisconsin Department of Justice and this court, copies of plaintiff's complaint and this order are being sent today to the Attorney General for service on the defendants. Under the agreement, the Department of Justice will have 40 days from the date of the Notice of Electronic Filing in this order to answer or otherwise plead to plaintiff's complaint if it accepts service for the defendants.

(5) For the time being, plaintiff must send defendants a copy of every paper or document he files with the court. Once plaintiff has learned what lawyer will be representing defendants, he should serve the lawyer directly rather than defendants. The court will disregard any documents submitted by plaintiff unless plaintiff shows on the court's copy that he has sent a copy to defendants or to defendant's attorney.

(6) Plaintiff should keep a copy of all documents for his own files. If plaintiff does not have access to a photocopy machine, he may send out identical handwritten or typed copies of his documents.

20

(7) If plaintiff is transferred or released while this case is pending, it is his obligation to inform the court of his new address.  If he fails to do this and defendants or the court are unable to locate him, his case may be dismissed for failure to prosecute.

Entered this 20th day of August, 2015

BY THE COURT:


/s/
_____
WILLIAM M. CONLEY
District Judge