IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

LOWMORREO HARRIS, SR.,

|  |  |  |
|---|---|---|
|  | Plaintiff, | OPINION AND ORDER |
| v. |  | 14-cv-047-wmc |
| JEFF JAEGER, *et al.*, |  |  |
|  | Defendants. |  |

---

This court gave *pro se* plaintiff Lowmorreo Harris leave to proceed on claims that certain officials at the New Lisbon Correctional Institution retaliated against him for filing grievances in violation of his First Amendment rights.  (Dkt. #16)  Harris was also granted leave to proceed on claims that defendants Jaeger and Baker violated his Fourteenth Amendment procedural due process rights as biased decisionmakers in hearing one of his conduct reports.  (*Id.*)  Pending before the court are the parties' cross motions for summary judgment.  (Dkt. ##59, 85.)

Because there are no facts in this record from which a reasonable jury could find that defendants Jaeger, Achterberg or Christopher Baker violated plaintiff's rights, those defendants will be granted summary judgment in their favor.  The court will, however, deny summary judgment to defendants Devendorf and Waterman because of the short time period between Harris's grievances and their alleged actions which might support a retaliatory inference against them.

UNDISPUTED FACTS[1]

## A. The Parties and Claims

At the time of the events relevant to this lawsuit, plaintiff Lowmorreo A. Harris was an inmate at the New Lisbon Correctional Institution ("NLCI"). Similarly, defendants Jeff Jaeger, Charles Devendorf, Jason Achterberg, Amanda Waterman and Christopher Baker were all Wisconsin Department of Corrections ("DOC") officials at NLCI.[2] During the relevant period, Jaeger was the Corrections Management Services Director; Devendorf, a Financial Specialist; Achterberg and Baker, Captains; and Waterman, a Segregation Property Officer.

Harris alleges that Services Director Jaeger and Financial Specialist Devendorf both retaliated against him after he filed grievances by interfering with his legal mail and issuing him conduct reports. At least as to the conduct report issued by Specialist Devendorf, Harris claims the allegations were fabricated. Harris further claims that Officer Waterman issued him a false conduct report at the direction of Captain Achterberg in retaliation for filing a grievance. Finally, Harris claims that Director Jaeger

---

[1] The court finds the following facts material and undisputed, unless noted otherwise. Plaintiff purports to dispute most of defendants' proposed facts, but the court only credits relevant responses that are supported by citation to the record and admissible at trial. *See* Fed. R. Civ. Pro. 56(c)(2); Court's Summary Judgment Procedures (dkt. #28); *see also Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007) ("In considering a motion for summary judgment, the district court is not required to scour the record in search of evidence to defeat the motion[.]"); *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000) ("Given their importance, we have consistently upheld a district court's discretion to require strict compliance with its local rules governing summary judgment."). Even giving plaintiff greater leeway as a *pro se* litigant, many of his so-called "disputed facts" do not begin to meet that definition for reasons explained in this opinion.

[2] Plaintiff originally identified Jason Achterberg as "Captain Acterberg," Amanda Waterman as "C/O Bender" and Christopher Baker as "Captain Baker."

and Captain Baker violated his procedural due process rights in ruling on the conduct report issued by Waterman.

### B. Conduct Reports for Using a False Name Issued by Director Jaeger

Under DOC rules, an inmate who uses a name other than the one under which he was committed to DOC is subject to punishment for using "false names and titles," unless he has legally changed his name.  Wis. Admin. Code § DOC 303.35.  When Harris was originally committed to DOC during his intake at the Dodge Correctional Institution ("DCI") on April 4, 2012, Harris actually had judgments of conviction from different Milwaukee County cases under two different names -- "Lowmorreo A. Harris" and "Mario A. Harris."  Defendants explain that DCI admitted Harris to DOC under the name "Harris, Mario A." because the judgment of conviction with that name reflected his earliest offense date.  (Pl.'s Exs. (dkt. 82-2) at ECF 108.)  Consistent with its practice, DCI, therefore, listed "Lowmorreo Harris" as an alias.[3]  (*Id.*)

---

[3] Plaintiff fails to raise a genuine dispute about his DOC committed name.  Specifically, plaintiff purports to dispute defendants' proposed fact that "the DOC inmate locator . . . identified Harris as Mario Harris with Lowmorreo listed as an identified alias" (Defs.' PFOF (dkt. #61) ¶ 40), but does so only by pointing out that "Mario Harris" is also listed as an alias on his DOC profile. (Pl.'s Resp. PFOF (dkt. #91) ¶ 40 (citing dkt. #82-2 at ECF 108).)  While that much is true, the DOC profile plaintiff cites also states his committed name unambiguously:  "NAME: HARRIS, MARIO A."  In contrast, the profile lists several different forms of the name "Lowmorreo" among his aliases, but never as his name.  (Pl.'s Exs. (dkt. #82-2) at ECF 108.)  Plaintiff fails to explain the foundation for his belief that his committed name was "Lowmorreo Harris," aside from asserting that (1) "Lowmorreo" is his birth name, (2) some of his judgments of conviction reflect that name, and (3) he received mail at NLCI under that name.  Defendants do not dispute any of those contentions, asserting that they are not material to the central issue regarding his conduct reports for using false names -- whether he was committed to DOC as "Mario Harris."

On June 20, 2012, Management Services Director Jaeger, who supervised staff in the business office and was responsible for approving or denying inmates' legal loan applications (Decl. of Jeffrey Jaeger (dkt. #64) ¶ 3), approved Harris's legal loan applications for three cases (*Harris v. Latino Auto Sales*, *Harris v. Nichole Adams* and *Harris v. City of Milwaukee*), but warned him that his loans for two of those cases (*Latino Auto Sales* and *Nichole Adams*) would be withdrawn if he did not provide case numbers for them by September 14, 2012.   (*Id.* at ¶ 8.)   The following day, Harris sent a disbursement request to the business office for five copies of his complaint in the *Nichole Adams* case.   (Defs.' Resp. PFOF (dkt. #106) ¶ 28.)   Harris signed his name "Mario Harris" on the disbursement request, but the complaint he wanted copied used the name and signature of "Lowmorreo Harris."   (*Id.* at ¶¶ 28-29.)   Despite that discrepancy, Financial Specialist Devendorf, who also worked in the business office, approved the five copies on June 29, 2012.  (*Id.* at ¶ 30.)   Harris was not issued a conduct report for using the name "Lowmorreo Harris" in this transaction.

On July 13, 2012, Harris sent a letter to the business office claiming that funds had been improperly deducted from his inmate account.  Specialist Devendorf responded with a July 17th letter that explained the deductions were made in accordance with DOC policy.   Unsatisfied, Harris attempted to file an inmate complaint dated the same day, but the Institution Complaint Examiner ("ICE"), Lynn Washetas, returned it to him on August 1, 2012, without processing it or assigning it a number.[4]

---

[4] ICE explained that the complaint was being returned because: (1) "Complaints shall contain only one issue and that issue shall be clearly identified"; and (2) "it appears the deductions were taken from your account on 7/5.  You would have received a trust account statement 7/6,

Specialist Devendorf sent a follow-up memorandum to Harris on August 1, 2012, responding to two information requests Harris had sent to the business office regarding his legal loan and supplies.  (Decl. of Charles Devendorf (dkt. #65) ¶ 12.)  On August 7, 2012, Devendorf sent Harris yet another letter (1) informing him that the business office was aware that he had filed a complaint "regarding legal loan supplies to the [ICE]," and (2) directing him to "cease all communication with the Business Office regarding legal loan supplies" until ICE issued a decision on that complaint.[5]  (Decl. of Lowmorreo A. Harris Exs. (dkt. #84-1) at ECF 37.)  Harris attempted to file another complaint about the business office, dated August 18, 2012, but ICE returned it to him on August 21st, advising him to contact Director Jaeger to address these issues.  (Defs.' Resp. PFOF (dkt. #106) ¶¶ 42-43.)

On August 22, 2012, the business office received written requests from Harris to make copies of documents signed by "Lowmorreo Harris" with funds from his legal loan.[6] After receiving this request, Devendorf "checked DOC's online database and verified his

---

indicating these deductions.  Please review allowable time limits in which a complaint may be filed . . . prior to re-submitting your complaint."  (Decl. of Lowmorreo A. Harris (dkt. #84-1) at ECF 29.)

[5] Devendorf explains that "[t]ypically, once an offender complaint is initiated regarding legal loan supplies, we await the outcome of the complaint before responding to anything pertinent to that issue," and, therefore, he attributes allegations of "[a]ny stalling of legal loan supplies . . . to [Harris's] pending offender complaint."  (Decl. of Charles Devendorf (dkt. #65) ¶ 15.) Additionally, while Devendorf's letter does not indicate to what he was referring by "this matter," Harris acknowledges that he filed a "series of complaints against the business office" after he "began experiencing stalling" with his legal loan (Aff. of Lowmorreo Harris (dkt. #88) ¶ 8.) Harris also  attached what appears to be at least one of those inmate complaints to an affidavit. (Aff. of Lowmorreo Harris Exs. (dkt. #90-1) at ECF 3-4.)

[6] The documents Harris submitted were related to his *Latino Auto Sales* case.  (*See* Decl. of Jeffrey Jaeger Ex. 109 (dkt. #64-3).)

committed name was Mario Harris," then "forwarded these documents" to Jaeger as well. (Decl. of Charles Devendorf (dkt. #65) ¶ 29.)  Having had the documents "brought to [his] attention," Jaeger: (1) "checked with the Records Office and verified Harris' committed name was Mario Harris and that he had not legally changed his name to anything else"; (2) "checked with property staff to see if he had a birth certificate or Social Security card on file at New Lisbon, which he did not"; and (3) "checked the DOC inmate locator, which identifies him as Mario Harris with Lowmorreo listed as an identified alias."  (Decl. of Jeffrey Jaeger (dkt. #64) ¶ 12.)  After verifying Harris's committed name, Director Jaeger wrote him a conduct report that same day for using a false name.  A hearing committee found that Harris had violated the prohibition against using false names on August 29, 2012, for which he was reprimanded.  (Decl. of Lynn Washetas Ex. 118 (dkt. #67-1) at 1-2.)

On August 22, 2012, defendant Baker placed Harris in the NLCI segregation unit pending the resolution of Jaeger's conduct report (Defs.' Resp. PFOF (dkt. #107) ¶ 17), and a "Review of Offender in Temporary Lockup" form in the record signed on August 28, 2012, indicates that a decision to retain Harris in temporary lockup pending the outcome of his conduct report was the result of the security director's "first 7-day review."  (Decl. of Lynn Washetas Ex. 118 (dkt. #67-1) at 10.)  There are no facts in the record as to when Harris was released from this period of temporary lockup, although the "reprimand" disposition of the conduct report would suggest that he was not held in segregation after being found guilty of using a false name the first time.  Defendants do

not dispute that Harris was strip searched before being placed in temporary lockup. (Defs.' Resp. PFOF (dkt. #107) ¶ 19.)

Despite being found guilty of the conduct charged in Jaeger's report, Harris persisted in submitting requests for copies of the summons and complaint in the *Nichole Adams* case on September 3, 2012, both of which were signed "Lowmorreo Harris." On September 7, 2012, Jaeger then emailed an attorney from the DOC's Office of Legal Counsel to ask whether the business office could require him to use "Mario Harris," since that remained his DOC committed name and the name for which his legal loan was approved. The attorney responded that she would deny Harris's legal loan requests if he only used an alias. (Decl. of Charles Devendorf Ex. 108 (dkt. #64-2).) That same day, Jaeger denied Harris's copy requests and returned the documents to Harris.

Harris then resubmitted the documents returned to him, this time whiting-out and changing "Lowmorreo" to "Mario" in the documents, including in his signature, which had already been notarized. In what was becoming a "Catch 22" situation, Jaeger responded to Harris with a memorandum on September 19, 2012, notifying him that the documents would not be processed, since they were now altered in violation of DOC rules. In that same memorandum, Jaeger explained that Harris could not use any name other than "Mario" as his first name, but that he could, for example, use "Mario (aka Lowmorreo) Harris."[7] Jaeger also notified Harris that his loans for the *Latino Auto Sales*

---

[7] At some point, Jaeger also claims that he verbally informed Harris about the option of including "aka Lowmorreo" and even wrote it down on a piece of paper in response to Harris's claim not to understand what Jaeger meant. (Decl. of Jeffrey Jaeger (dkt. #64) ¶ 27.) As for why Jaeger did not issue Harris another conduct report for using false names, he explained in the September 19, 2012, memorandum that the "only reason" he did not do so was because the *Nichole Adams*

and *Nichole Adams* cases would be withdrawn because he had failed to submit case numbers to the business office by the deadline established when Jaeger conditionally approved those loans in June of 2012.

Two days after notifying Harris about the cancellation of his loans, on September 21, 2012, Director Jaeger sent Harris another memorandum informing him that his loan would be reinstated for the *Nichole Adams* case, since Devendorf and he had discovered the case number after they "reviewed case numbers for filing fees."  (Decl. of Jeffrey Jaeger Ex. 110 (dkt. #64-4).)   Jaeger also informed Harris that copies of his altered summons and complaint would be returned for his records, but that Jaeger would keep the originals, since they were "altered notarized legal document[s], which [would] be retained for future reference/discipline, if warranted."   (*Id.*)   Director Jaeger also instructed Harris that he would need to resubmit any documents that he wanted to be copied, along with a new disbursement request.  (*Id.*)

In direct defiance of these warnings – whether because he felt out of options, or was just being obstinate, or both -- Harris resubmitted the same, altered summons and complaint for copying.  Predictably enough, Jaeger responded by memorandum, dated September 28, 2012, advising that the documents would be seized as evidence and not returned.   Jaeger also warned Harris in that memorandum that he would be issued a conduct report if he continued to submit altered documents.  (Decl. of Jeffrey Jaeger Ex. 111 (dkt. #64-5).)   In response to the memorandum, Harris sent Director Jaeger an

---

documents predated the *Latino Auto Sales* documents.   (Decl. of Jeffrey Jaeger Ex. 109 (dkt. #64-3).)

interview/information request, claiming that he had not been informed his resubmission of the altered copies was prohibited.

While Jaeger never issued a conduct report for submitting or resubmitting those altered documents, he did issue Harris another conduct report for using a false name some four months later.[8]   This February 1, 2013, conduct report was based on "two pieces of correspondence from Harris for processing under his legal loan," in which "Harris used and/or signed his name as Lowmorreo Harris."[9]   (Defs.' Reply PFOF (dkt. #108) ¶ 61.)  A hearing committee found on February 13, 2013, that Harris had again violated the prohibition on using false names, for which he ultimately received 180 days in segregation.[10]

## C. Alleged Interference with Mail and Conduct Report Issued by Financial Specialist Devendorf

Harris claims that both Director Jaeger and Specialist Devendorf interfered with his legal mail in retaliation for earlier filed grievances against them.  In November of

---

[8] Plaintiff filed an inmate complaint dated January 31, 2013, alleging that Jaeger found him guilty on a conduct report for lying about staff (discussed below in section D) for retaliatory reasons. ICE did not acknowledge receipt of that complaint until February 4, 2013 (Defs. Resp. PFOF (dkt. #107) ¶ 87 (citing Decl. of Lynn Washetas Ex. 128 (dkt. #67-11)), which is the same day that the security director reviewed Jaeger's second conduct report and delivered it to Harris.  (*Id.* at ¶ 88 (citing Decl. of Lynn Washetas Ex. 120 (dkt. #67-3) at ECF 2).)

[9] While defendants do not cite to the "two pieces of correspondence," documents in the record attached to the conduct report include two letters signed "Lowmorreo Harris" and a disbursement request from Harris related to the *Latino Auto Sales* case, dated January 29, 2013.  (Decl. of Lynn Washetas Ex. 120 (dkt. #67-3) at ECF 16-18, 21-23.)

[10] Harris successfully appealed his original penalty of 330 days in segregation, which was determined to exceed the maximum penalty for that DOC violation.  (Decl. of Lynn Washetas Ex. 120 (dkt. #67-3) at 1.)

2012, after receiving notification that a trust account statement for one of his cases had not been certified, Harris sent a follow up request to the business office.  While Devendorf admits that he failed to mail a certified copy of the trust account statement in response to Harris's first request, Devendorf also claims that the omission was inadvertent and that he immediately corrected his mistake at no additional charge to Harris once he was alerted to it.  Nevertheless, Harris filed a complaint against the business office on November 14, 2012, for failing to certify copies of his inmate trust account, causing him to incur an additional charge for postage.

On December 10, 2012, ICE Brendan Ingenthron acknowledged receipt of this first complaint, which he rejected for Harris's "refusal to cooperate with the investigation."  (Decl. of Lynn Washetas Ex. 123 (dkt. #67-6) at 2.)  On December 21, 2012, ICE acknowledged receipt of Harris's second inmate complaint against the business office, this time claiming that he was repeatedly denied a legal loan for a case involving termination of his parental rights.  (Decl. of Lynn Washetas Ex. 124 (dkt. #67-7) at 1.)  ICE Ingenthron dismissed Harris's second complaint on December 26, 2012, because Devendorf and Jaeger told him that Harris had asked about mailing items to a social worker but had not actually requested a legal loan for his parental rights case. (*Id.* at 2.)

On January 2, 2013, Specialist Devendorf was working in the records office during office hours when Harris visited with a disbursement request to receive blank sheets of paper.  Devendorf told Harris that he would deliver the paper when he returned to the

10

business office.  When Harris offered to instead go get the paper from the librarian, however, Devendorf assented.

While in material agreement on most of the facts, the parties dispute whether Devendorf authorized Harris to receive 50 or 150 sheets.  According to Harris, he handed Devendorf a request for 150 sheets, which Devendorf then approved. Devendorf, on the other hand, asserts that the request read fifty sheets when he approved it, consistent with policy regarding the maximum number of sheets an inmate can receive per week.  (Decl. of Lynn Washetas Ex. 122 [Wisconsin Division of Adult Institution Policy # 309.51.01] (dkt. #67-5) at ECF 9.)  Devendorf claims that he first noticed Harris had altered the approval to read 150 sheets the following day, when he reviewed the disbursement slip before posting it to Harris's legal loan.  On January 3, 2013, after Devendorf voiced his concern about the altered disbursement slip, Harris was moved to segregation under temporary lockup status ("TLU") pending administrative action on Devendorf's expected conduct report.

Inmates placed in segregation under TLU have all of the property in their general population cells inventoried and moved to the property room.  Those inmates must sign an inventory sheet before they can receive their property, which is typically delivered the following weekday, provided the segregation unit is adequately staffed.  Harris refused to sign the inventory sheet on January 4, 2013.

After contacting the librarian to confirm that Harris had indeed received 150 sheets from her, Devendorf wrote Harris a conduct report for altering the disbursement

slip on January 7, 2013.   Harris was found guilty of this conduct report after a disciplinary hearing and received 90 days in segregation.

### D. Conduct Report Issued by Officer Waterman

On January 13, Harris sent the security director an "interview/information request" claiming that he was being denied access both to his legal materials and the law library while in segregation.   (Decl. of Jason Achterberg Ex. 101 (dkt. #62-1).)   Harris also claimed that he had been "attacked" by four, unnamed staff members, though not physically, in retaliation for filing grievances.   (*Id.*)

On January 14, Captain Achterberg, another of the defendants, responded on behalf of the security director, informing Harris that he would need to follow directions from segregation staff regarding law library time while under TLU.   Captain Achterberg also advised that Harris would need to provide more information for him to act on his claim of retaliation, adding that Harris could be issued a conduct report if his claim of staff "attacking" him was "found to be untruthful."   (Decl. of Jason Achterberg Ex. 102 (dkt. #62-2).)

That same day, Harris submitted a TLU property request form.   As the Segregation Property Officer, Waterman delivered the property to Harris the following day, although the parties dispute what happened during the delivery itself.   According to Officer Waterman, she put all of the papers belonging to Harris on his trap door, but he refused to take some of them, saying, "I don't need these."   (Decl. of Amanda Waterman Ex. 105 (dkt. #63-2).)   Harris denies saying this.   He also denies returning any of his

papers.  Rather, he claims Waterman threw his papers onto the floor and said that he "whines too much."  Harris also asserts Waterman remarked that he did not need legal papers with "Jeff Jaeger's name on them."  (Aff. of Lowmorreo A. Harris (dkt. #88) ¶ 54.)

Captain Achterberg received another interview/information request from Harris on January 18, 2013, in which he again complained that he had yet to receive "large portions" of his legal materials and also claimed that Officer Waterman had thrown his papers onto his cell floor to disrespect him.  (Decl. of Jason Achterburg Ex. 103 (dkt. #62-3).)  Among other things, Harris also wrote in this interview/information request form that:  (1) "it is believed that [Waterman] or another officer has [taken] legal papers from my [property]"; (2) "she has denied legal property that she feels is not legal"; (3) "she has read my legal papers in front of me; and (4) "she has [talked] to me like I'm a dog."  (*Id.*)  Captain Achterberg forwarded this interview/information request to Officer Waterman, as well as spoke to her about it.  (Decl. of Amanda Waterman (dkt. #63) ¶ 9, 10.)  He claims this process was consistent with his customary practice to "discuss concerns regarding specific staff members with that staff member."  (Decl. of Jason Achterberg (dkt. #62) ¶ 8.)  After Waterman denied Harris's allegations, Achterberg advised her to issue Harris a conduct report for lying about staff.  On January 22, 2013, Waterman notified Harris that he would be receiving a conduct report for lying about staff.  On January 24, Harris received that report, along with notice of a disciplinary hearing.

### E. Disciplinary Hearing

A hearing was held on Harris's conduct report for lying about staff on January 31, 2013.  Management Services Director Jaeger and Captain Baker were the two committee members for that hearing, having been assigned by the Warden.  Jaeger was obviously familiar with Harris from his earlier transactions with the business office and related grievances.  Additionally, Harris alleges that on August 22, 2012, Captain Baker escorted Harris to segregation under TLU pending a decision on his first conduct report for using false names.  At that time, Harris claims Baker said that he "would quickly find out what . . . to start doing and stop doing in order to have a comfortable stay," and he also is claimed to have said, "you['re] not going to be here very long if you keep messing up with staff."[11]  (Aff. of Lowmorreo A. Harris (dkt. #88) ¶ 11.)

Even so, Harris did not contemporaneously object to either Jaeger or Baker serving on the hearing committee.  Harris explains that he did not recognize Jaeger, having never met him in person, and that Jaeger and Baker did not announce their names at the outset of the hearing.  (Decl. of Lowmorreo A. Harris (dkt. #93) ¶ 62.)  Still, Harris was unable to explain his failure to object to Baker's participation, even though he claims Baker told him shortly before the hearing, "so you still haven't learned about lying on my staff."  (*Id.* at ¶ 67.)  Baker denied making any of these statements, and at the close of the hearing, Director Jaeger and Captain Baker found Harris guilty of the conduct charged in the report.

---

[11] As plaintiff points out, Baker also served on the hearing committee for the conduct report Devendorf gave Harris for altering a disbursement slip.  (Pl.'s PFOF (dkt. #87) ¶ 68; Decl. of Lynn Washetas Ex. 119 (dkt. #67-2) at ECF 11.)

On February 4, 2013, ICE received a further complaint from Harris, this time alleging that Jaeger served on the hearing committee for retaliatory reasons, but he did not raise the same claim against Baker.  (Decl. of Lynn Washetas Ex. 11 (dkt. #67-11) at 9.)  Harris also appealed Jaeger and Baker's decision.  After that decision was upheld on February 18, 2013, Harris ultimately served 300 days in segregation for his conduct.

OPINION

I.    RETALIATION

To make out a prima facie case of retaliation, Harris must demonstrate that: (1) he engaged in an activity protected by the First Amendment; (2) the defendant's conduct would deter a person of "ordinary firmness" from engaging in this protected activity in the future; and (3) the protected activity was at least a motivating factor in the defendant's decision to take the retaliatory action.  *See Kidwell v. Eisenhauer*, 679 F.3d 957, 964-65 (7th Cir. 2012); *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009).  If Harris advances evidence that his protected activity was a motivating factor, or sufficient condition, of any defendant's decision to retaliate, then the burden shifts to the defendant to demonstrate that he or she would have taken the same actions "even in the absence of protected conduct."  *Greene v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011).

In moving for summary judgment, defendants primarily argue that plaintiff cannot show any protected activity was a motivating factor with respect to any of the allegedly retaliatory actions taken.  Accordingly, the court does not address the first two elements of plaintiff's prima facie case.

### A. Jaeger

Harris claims that Management Services Director Jaeger retaliated against him for grievances he filed against Jaeger and the business office in two ways:  (1) interfering with his legal mail and (2) issuing false conduct reports.  The interference with mail claim is straightforward.  Plaintiff offers *no* evidence that Jaeger interfered with his mail, and his speculation alone cannot save his retaliation claim against Jaeger on that ground.  *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).

The conduct reports require closer analysis, but even viewing the record in Harris's favor, the court cannot conclude that there is evidence to support a reasonable inference that Jaeger had a retaliatory motive.  First and foremost, Jaeger avers that he issued them for a valid reason -- Harris repeatedly violated DOC policy by failing to use his DOC committed name in documents submitted to the business office for copying -- not because of any retaliatory motive.  Moreover, Harris offers no facts suggesting that the conduct reports were somehow invalid or that he was not committed to DOC under the name "Mario Harris."

Harris's claim is a stretch for at least three reasons.  First, there is no dispute that it was *Devendorf*, not Jaeger, who flagged the signature infraction on August 22nd, the earliest date Harris would have talked to Jaeger about his complaint, much less took the time to let Devendorf know about it.  Second, there is no dispute that Harris *was* violating policy, and doing so surreptitiously by signing his institution name internally, while using other variations in legal filings.  Third, even after Jaeger warned Harris about using "Lowmorreo," Harris obstinately submitted documents to the business office with

the wrong name not once, but at least twice more, before Jaeger issued him a second conduct report, and it was only after this report was filed that a hearing committee imposed 180 days in segregation.  Indeed, that second conduct report was in response to Harris's *third*, obviously *deliberate* violation some five months after receiving the first conduct report for using "Lowmorreo," and after being expressly warned against doing so again.

A few circumstantial facts tend to support Harris's claim, but only as to the August conduct report.  First, Harris is correct that Jaeger issued the first conduct report within days of Harris filing his complaint.  The factual record shows that on August 20, 2012, ICE received Harris's complaint about the business office, dated August 18, 2012, and that ICE returned the complaint to him on August 21, 2012, with directions to contact Jaeger to resolve the issues he raised.  The next day, August 22, 2012, Jaeger issued Harris a conduct report for using the name "Lowmorreo" on documents for which he requested copies.  Additionally, Financial Specialist Devendorf had previously approved Harris's request for copies of documents that he also signed as "Lowmorreo" on June 29, 2012.  Finally, while Jaeger checked with DOC's Office of Legal Counsel regarding whether he could require Harris to use "Mario Harris," and warned Harris about using "Lowmorreo" when Harris submitted his September 3, 2012, request, Jaeger did not take any of these steps before issuing the August conduct report.

Viewed extremely generously in Harris's favor, a reasonable jury could infer that the conduct reports were motivated by Harris's grievances about the business office, but that conclusion assumes that Jaeger actually *knew* about the grievances in the first place.

17

This is where Harris's claim fails:  neither party points to evidence tending to establish that Jaeger knew that Harris had filed a grievance about him or the business office.  With respect to the August conduct report, neither party cites evidence that Jaeger and Harris actually met to resolve Harris's inmate complaint, as ICE directed Harris to do on August 20, 2012.  The record actually indicates that no such meeting took place, and there is nothing else in the record suggesting that Jaeger knew about Harris's complaint.

For one, Harris acknowledges that he was directed to speak with Jaeger, but states that he "sent another request slip to [Jaeger] on August 21, 2012," and received no response.  Harris does not assert that he either met with Jaeger or included a complaint in his August 21 request slip.[12]   Additionally, while Jaeger states that before the disciplinary hearing on January 31, 2013, he and Harris "had previously met on several occasions involving his legal loans and/or issues pertaining to his DOC committed name," he does not provide any dates that would establish that the two met after Harris filed the grievance but before Jaeger issued the conduct report.  (Decl. of Jeffrey Jaeger (dkt. #64) ¶ 33.)  Finally, Harris himself averred that he does not remember ever meeting Jaeger in person before the January 31st hearing. (Decl. of Lowmorreo A. Harris (dkt. #93) ¶ 62.)

To proceed past summary judgment, a plaintiff must affirmatively demonstrate what evidence he has in support of his claims.  *See Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892, 901 (7th Cir. 2003) (describing summary judgment as "the 'put up or shut up'

---

[12] An "interview/information request" form addressed to the business office that Harris attached to his complaint, dated August 21, 2012, contained a request for supplies, including envelopes, pads of paper and pens, but nothing regarding any complaints against the business office, Jaeger or Devendorf.  (Dkt. #1-2 at ECF 24-25.)

moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events") (quoting *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)).   Given Harris's failure to present any evidence that Jaeger knew about his August 18th inmate complaint, no reasonable jury could find that Jaeger had a retaliatory motive in issuing the first conduct report.  *See Morfin v. City of E. Chi.*, 349 F.3d 989, 1005 (7th Cir. 2003) ("The protected conduct cannot be proven to motivate retaliation if there is no evidence that the defendants knew of the protected activity.") (internal quotation marks and brackets omitted) (quoting *Stagman v. Ryan*, 176 F.3d 986, 1000-01 (7th Cir. 1999)).   Likewise, no reasonable jury could find that Jaeger had a retaliatory motive with respect to the second conduct report, dated February 1, 2013, since there is no evidence that Jaeger knew about Harris's inmate complaint, dated January 31, 2013, which ICE did not receive until February 4, 2013.[13]   *See id.* Accordingly, Jaeger is entitled to summary judgment on plaintiff's retaliation claim.


**B. Devendorf**

Harris similarly alleges that Devendorf retaliated against him for filing inmate complaints by interfering with his legal mail and by issuing a false conduct report for altering a disbursement request.   As with his claim that Jaeger interfered with his legal mail in retaliation for his inmate complaints, Harris's retaliation claim against Devendorf based on interference with his legal mail falls short.   Devendorf responded to Harris's

---

[13] The result here might be different were Harris being disciplined for some protected activity, even if warned against it, but using a false name is not one of those activities.

concerns about interference with his legal mail with explanations of DOC policy, and he asserts that his failure to mail a certified copy of Harris's trust account statement was a mistake that he immediately remedied when first alerted about it.  Harris offers no evidence to rebut Devendorf's non-retaliatory justifications as pretextual, and so he cannot establish that any protected activity was a motivating factor.

As for Harris's claim that Devendorf lied about him altering the disbursement slip to receive 150 sheets of paper, there is evidence in the record that Devendorf knew about Harris's inmate complaint against the business office, dated December 21, 2012, which ICE dismissed five days later based on Devendorf and Jaeger's contrary representations. In light of the short proximity of time between Harris's complaint and the events on January 2 and 3, 2013, which gave rise to Devendorf's conduct report issued on January 7th, an adverse inference might be drawn against Devendorf.  *See Kidwell*, 679 F.3d at 966 ("For an inference of causation to be drawn solely on the basis of a suspicious-timing argument, we typically allow no more than a few days to elapse between the protected activity and the adverse action.").  Regardless, because the question whether the conduct report was based on a false accusation hinges on a dispute of fact that turns on credibility, the court cannot resolve plaintiff's retaliation claim against Devendorf at summary judgment.  *See Townsend v. Fuchs*, 522 F.3d 765, 774 (7th Cir. 2008) ("Thus, the dispute . . . comes down to a good old-fashioned swearing contest that can be resolved only by assessing the credibility of the two [witnesses].   Credibility determinations, however, lie exclusively within the fact finder's domain and are not

appropriate for a district court to make at the summary judgment stage."). Accordingly, Devendorf is not entitled to summary judgment.

### C. Waterman

Next, plaintiff claims that Officer Waterman retaliated against him in violation of the First Amendment by withholding papers he requested and by issuing a false conduct report against him for lying about staff. Again, there is only a short period of time -- four days -- between Achterberg's receipt of Harris's interview/information request form complaining about Waterman's behavior and her notification to Harris that she would be issuing a conduct report against him for lying about staff. A reasonable jury could infer a retaliatory motive from that narrow proximity of time. *See Kidwell*, 679 F.3d at 966. And again, whether Waterman was justified in issuing her conduct report depends on which party's account of events is more credible, which the court cannot resolve at summary judgment. *See Townsend*, 522 F.3d at 774. Accordingly, the court will also deny Waterman's motion for summary judgment.

### D. Achterberg

Harris also alleges that Captain Achterberg retaliated against him by directing Waterman to issue her false conduct report. To support an inference that Achterberg had a retaliatory motive, Harris points to his statement that Harris could be punished if representations in his information/interview request were proven to be false. Nothing about that statement supports an inference of retaliation, since it accurately states DOC

21

policy.  Even if the statement could support a retaliatory motive, the only evidence of protected activity in the record about which Achterberg was aware is Harris's interview/information request concerning Waterman.  Harris adduces no evidence of any complaints about Achterberg, nor any evidence that Achterburg knew (or should have known) that Waterman's representation to him was false.   For these reasons, no reasonable jury could infer that Achterberg had a retaliatory motive, and Harris's retaliation claim against him fails.

### E.  Baker

Finally, plaintiff's claim that Captain Baker retaliated against him by finding him guilty of a false conduct report and punishing him with segregation falls short.  First, in response to Baker's assertion that he was not aware of any of Harris's grievances -- other than Waterman's conduct report for his lying about staff that Baker considered while serving on the disciplinary hearing committee -- Harris identifies no evidence to the contrary.  *See Morfin*, 349 F.3d at 1005.  Second, Baker articulated an adequate basis to find Harris guilty of the conduct report, given Waterman's testimony and his own determination that the other inmate witness who corroborated Harris's account lacked a clear vantage point to see Waterman's claimed conduct.   (Decl. of Christopher Baker (dkt. #68) ¶ 12.)  In light of these facts, Baker's statements (that Harris "would quickly find out what . . . to start doing and stop doing in order to have a comfortable stay"; that Harris was "not going to be [at NCLI] very long if [he kept] messing up with staff"; and that Harris "still [hadn't] learned about lying on [Baker's] staff") are not enough to

establish that Baker's justifications for his guilty finding are pretextual.  Thus, Baker is entitled to summary judgment on plaintiff's retaliation claim as well.

## II.   PROCEDURAL DUE PROCESS

To prevail on a claim that he was deprived procedural due process in connection with a prison disciplinary hearing, a plaintiff must establish that: (1) he has been deprived of a liberty or property interest; and (2) that "the procedures attendant upon that deprivation were constitutionally insufficient."  *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989); *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007).   For summary judgment purposes, defendants do not dispute that the circumstances surrounding Harris's confinement in disciplinary segregation for 300 days as a result of Waterman's conduct report give rise to a liberty interest entitling him to informal due process.  (Defs.' Opening Br. (dkt. #60) at 22.)

Defendants argue instead that "[d]ue process requires recusal . . . only where the decision-maker has a direct personal or otherwise substantial involvement in the circumstances underlying the issue being reviewed."  (*Id.* at 24 (citing *Redding v. Fairman*, 717 F.2d 1105, 1113 (7th Cir. 1983)).  While the standard by which a plaintiff can prevail on a Fourteenth Amendment procedural due process claim has not been clearly defined in the Seventh Circuit, defendants likely read it too narrowly.  For example, at least in the habeas corpus context, the Seventh Circuit has considered evidence as to whether a prisoner was denied procedural due process rights because a decisionmaker had prejudged guilt.  *See Daher v. Vannatta*, 118 F. App'x 981, 984 (7th Cir. 2004);

*Zimmerman v. Hanks*, 248 F.3d 1162, 2000 WL 1871671, at *4 (Table) (7th Cir. Dec. 19, 2000) ("It is true that a prisoner has a right to have a disciplinary hearing conducted by an impartial decision maker[.]") (citing *Wolff v. McDonnell*, 418 U.S. 539, 571 (1974)).

Thus, plaintiff might prevail on his procedural due process claims against Jaeger and Baker by establishing that they had prejudged his guilt before the conduct report hearing. *See Westefer v. Neal*, 682 F.3d 679, 685 (7th Cir. 2012) (noting that informal due process afforded to prisoners in administrative disciplinary proceedings requires "only a single prison official . . . as the *neutral* reviewer.") (emphasis added). That said, "[a]djudicators are entitled to a presumption of honesty and integrity, and thus the constitutional standard for permissible bias is high." *See Piggie v. Cotton*, 342 F.3d 660, 666 (7th Cir. 2003) (citations omitted). In addition, "requiring each staff member who is the subject of a separate lawsuit [from an inmate] to disqualify himself from sitting in judgment of that inmate would heavily tax the working capacity of the prison staff," and so plaintiff must do more than merely point to prior complaints or conduct reports involving the decisionmakers. *Redding*, 717 F.2d at 1113; *see also Piggie*, 342 F.3d at 667 ("It seems to us that a rule automatically disqualifying any CAB [("conduct adjustment board")] member from adjudicating a prisoner's habitual case because he or she was a witness to events underlying one of the prisoner's prior convictions would be infeasible.").

### A. Jaeger

By the time Management Director Jaeger sat on the disciplinary hearing committee for Harris's conduct report for lying about staff, he had given Harris two conduct reports for using a false name, and he had been the subject of an inmate complaint from Harris, multiple complaints if you also count those against the business office.  Unlike Baker, Harris does not allege that Jaeger made any comments before the hearing suggesting that he had already determined his guilt, and simply pointing to his inmate complaints against Jaeger is not enough to establish a violation of his procedural due process rights.  *See Piggie*, 342 F.3d at 667.  Furthermore, there remains no genuine dispute whether Jaeger issued the conduct reports for using a false name for retaliatory reasons, and Jaeger had no involvement in the events underlying the January 24, 2013, conduct report issued by Waterman.

As already discussed, Jaeger and Baker's findings after the hearing reflect reliance on adequate evidence, including Waterman's testimony at the hearing and their conclusion that the inmate witness who corroborated Harris's account about Waterman throwing his paper onto the floor likely lacked a sufficient viewpoint to see the events in Harris's cell across the hall.  (Decl. of Lynn Washetas Ex. 121 (dkt. #67-4) at 10-11.)  Jaeger, therefore, is entitled to summary judgment on Harris's due process claim.

### B. Baker

In addition to pointing to Captain Baker's familiarity with him before the conduct report hearing, Harris offers some evidence that Baker had prejudged his guilt before the

25

hearing, in contrast to Jaeger. Specifically, Baker supposedly told him, "so, you still haven't learned about lying on my staff." But while Baker's statement raises the suspicion that he was inclined to find against Harris on the conduct report, that statement alone is insufficient to establish a deprivation of his procedural due process rights, at least in light of sufficient evidence to support Baker's finding of guilt, something Jaeger and Baker adequately explained in the committee's decision on the conduct report.[14]   (*Id.*)   *See Daher*, 118 F. App'x at 984 (affirming district court's rejection of plaintiff's habeas corpus petition for revocation of earned credit time because despite his claim that the conduct adjustment board members were arguing about sanctions to apply before the hearing began, he did not "allege that the CAB members failed to give him a full opportunity to present his case or to listen carefully to his presentation"); *Zimmerman*, 2000 WL 1871671, at *4 (plaintiff's allegations in habeas corpus challenge to loss of good-time credit that the CAB member "was antagonistic during the hearing and must have been predisposed to find him guilty because he stated that [plaintiff] could use the documents he compiled to appeal the CAB decision" were insufficient to overcome the presumption of honesty and integrity). Accordingly,

---

[14] Any inference of Baker's bias is further weakened by Harris's failure to challenge his statement or complain about his presence on the committee in a grievance or on administrative appeal. Among other things, this contrasts with Harris's inmate complaint that Jaeger retaliated against him by serving on the hearing committee and finding him guilty of Waterman's conduct report (Decl. of Lynn Washetas Ex. 128 (dkt. #67-11) at 9). *Cf. Eads v. Hanks*, 280 F.3d 728, 729 (7th Cir. 2002) (commenting on the plaintiff's failure to raise the issue of a committee member's bias on administrative appeal in context of habeas corpus challenge to revocation of good-time credit that "[i]nsistence on a timely complaint of a potentially disqualifying personal relationship is imperative," since "[t]he later the claim is made, the likelier it is to be a last minute invention") (internal citation omitted).

plaintiff cannot establish that Baker violated his procedural due process rights by serving on the hearing committee.

## III.   NEXT STEPS

Consistent with the court's rulings above, Harris may proceed past summary judgment on his claims that: (1) Devendorf retaliated against him by issuing a false conduct report for altering a disbursement slip; and (2) Waterman retaliated against him by issuing a false conduct report for lying about staff.[15]   There is, however, no need to recruit counsel, given the straightforward "he said, she said" nature of the remaining disputes.   Indeed, the court will craft a set of instructions to focus the jury on the remaining liability issues, and Harris is more than capable of describing his damages if it comes to that.[16]

---

[15] Defendants are not entitled to qualified immunity on the remaining claims, since it is clearly established law that prison officials cannot retaliate against inmates by writing false disciplinary charges.  *Prude v. Pollard*, No. 13-cv-512-bbc, slip op. at 15-16 (W.D. Wis. July 2, 2014) ("If I accept as true plaintiff's version of the facts, then it is clearly established that defendants violated plaintiff's constitutional rights because, even under the strictest view of a prisoner's First Amendment rights, prison officials may not retaliate against a prisoner for making false accusations when they know the accusations are true.").

[16] The court will not grant summary judgment to defendants as to the availability of punitive damages to plaintiff, given the remaining issues regarding whether Devendorf and Waterman lied about the events underlying the conduct reports they issued.   Although highly doubtful on this factual record, the jury might infer the necessary intent to support punitive damages if it resolved those issues in plaintiff's favor.  *See Wright v. Miller*, 561 F. App'x 551, 555-56 (7th Cir. 2014) ("[T]o award punitive damages, a jury must find that [the defendant] was 'motivated by evil intent' or acted with 'reckless or callous indifference' to [the plaintiff's] constitutional rights.") (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)).

Based on these rulings, the court will re-establish a trial schedule. Finally, in light of the court's rulings in this opinion, plaintiff's remaining motions will be denied as moot.

## ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #59) is GRANTED IN PART and DENIED IN PART, consistent with this opinion.

2) Plaintiff's motion for summary judgment (dkt. #85) is DENIED.

3) Plaintiff's remaining motions (dkt. ##103, 112, 120, 122, 123, 124, 131, 133, 134) are DENIED as moot.

Entered this 14th day of March, 2017.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge